## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------------------------------x
JONATHAN VALDES                          :      CASE ACTION NO.
        Plaintiffs                       :
                                         :
v.                                       :
                                         :
BURRIS LOGISTICS CO.                     :
        Defendant                        :      JULY 17, 2012
-----------------------------------------------------x
```

## COMPLAINT

### INTRODUCTION:

1. This is an action to redress employment retaliation in violation of the Fair Labor Standards Act, 29 U.S.C.A. Sec. 215, *et seq.*, as well as common law wrongful discharge in violation of public policy, violation of Conn. Gen. Stat. Sec. 31-51q, breach of the implied covenant of good faith and fair dealing, and discrimination and retaliation in violation of the Connecticut Workers' Compensation Act, Conn. Gen. Stat. Sec. 31-290a, *et seq.*

### PARTIES AND JURISDICTION:

2. The plaintiff, Jonathan Valdes, (hereinafter referred to as "the Plaintiff"), is a resident of the Town of Manchester, State of Connecticut.

3. At all relevant times herein, the defendant Burris Logistics Co. (the "Defendant") was and is a Delaware corporation with its principal place of business in Delaware. The Defendant operates twelve warehouse locations across eight states throughout the eastern United States. The Defendant primarily engages in the business of storage and distribution of refrigerated and frozen foods.

1

Defendant operates twelve warehouse facilities, targeting wholesale distribution to retail food vendors, focusing on the wholesale market.

4.     At all times relevant herein, the Defendant owned and operated a warehouse operation which distributed refrigerated and frozen food in the Town of Rocky Hill, State of Connecticut.

5.     Jurisdiction of this Court is invoked under the provisions of 28 U.S.C. §1331, federal question jurisdiction, as the Plaintiff's claims arise under the laws of the United States, namely, the Fair labor Standards Act, 29 U.S.C.A. Sec. 215, *et seq.*

6.     The Plaintiff worked for the defendant Company from on or about August 18, 2008 through the wrongful termination of his employment on or about February 21, 2012.

7.     The Plaintiff performed the duties of an Incentive Selector and Incentive Lift Operator.

8.     The duties of Incentive Selectors were as follows:

   a.  Performing all tasks required of them;
   b.  Selecting, labeling, wrapping, loading, and documenting orders for customers;
   c.  Rebuilding pallets;
   d.  Re-handling cases for loading or other purposes;
   e.  Combining small pallets;
   f.  Cleaning up all areas of the facility;
   g.  Preparing to work;
   h.  Battery or equipment changes;
   i.  Ensuring safe working conditions;
   j.  Picking up and processing damaged cases;
   k.  Specific projects assigned by supervision; and
   l.  Unproductive time spent waiting to perform any of the above after commencement of the shift.

9.  The duties of Incentive Lift Operators were as follows:

a. Performing all tasks required of them;
b. Moving of inbound product from the floor to designated reserve positions and from reserve slots to the designated pick slots;
c. Unwrapping of pallets;
d. Handling inbound pallets;
e. Moving reserve pallets to pick slots;
f. Moving pallets found in the wrong location or that will not fit into a pick slot;
g. Properly rotating product in pick slots and overhead reserves;
h. Removing wrap, slip sheets, and cardboard from pallets being placed into pick slots and throwing them away in the appropriate location;
i. Making appropriate entries on the forklift computer system;
j. Picking up empty pallets with the forklift and stacking them where appropriate;
k. Handling cases in the course of filling a pick slot;
l. Removing empty pallets from pick slots;
m. Cleaning up all areas of the facility;
n. Preparing to work;
o. Battery or equipment changes;
p. Time spent ensuring safe working conditions;
q. Picking up and processing damaged cases;
r. Specific projects assigned by supervision; and
s. Unproductive time spent waiting to perform any of the above after the commencement of the shift.

10.    The Plaintiff was generally responsible for moving inbound and outbound product to and from designated positions between refrigerator or freezer and the trailer trucks for distribution.

11.    The Plaintiff was paid utilizing a malleable time management system to provide incentive for employees to work faster.

12.    The Defendant did not provide the Plaintiff with a written document explaining this complex wage calculation system.

13.    The Defendant orally represented to the Plaintiff that his rate of pay would be divided into three main categories: the "Base Rate," the "Incentive Rate," and the "13 Week Average Rate."

3

14.     The Defendant represented to the Plaintiff that he would be paid at least at the Base Rate of $12.00 per hour for every hour worked.

15.     The Base Rate was the lowest amount the Plaintiff was supposed to earn per hour: a floor of $12.00 per hour.

16.     The Defendant did not pay at least the Base Rate for every hour worked.

17.     Employees were to be paid an Incentive Rate, not as a discretionary bonus, but rather as a rate which the employee earned by performing assignments faster.

18.     The Incentive Rate would be paid for performing assignments that were engineered for a standard number of minutes, called the "Engineered Standard Times."

19.     The Engineered Standard Times depended upon numerous factors, such as the distance which product was to travel and the amount of product transported.

20.     The number of minutes it actually took employees to complete assignments with Engineered Standard Times would be recorded as their "Actual Time."

21.     Actual Time should only have been recorded as time spent performing tasks with Engineered Standard Times because the exact start and completion times were recorded by computer.

22.     The Defendant represented to the employees that the Actual Time to perform assignments with Engineered Standard Times would be recorded by a system called APT.

23.     The Incentive Rate would be paid based upon an employee's "Performance Percentage."

24.     The Performance Percentage is the Engineered Standard Time divided by the Actual Time to perform the assignments.  If a worker completed an assignment with an Engineered Standard Time of 30 minutes in 20 actual minutes, the Performance Percentage was 150%.  If a worker completed an assignment with an Engineered Standard time of 30 minutes in 30 actual minutes, the Performance Percentage was 100%.  If a worker completed an assignment with an Engineered Standard time of 30 minutes in 37.5 minutes, the Performance Percentage was 80%.

25.     The Performance Percentage determined the Incentive Rate through a scale which Defendant had created, hereafter referred to as the "Incentive Compensation Scale."

26.     The Incentive Rate was to be determined based upon where employees' Performance Percentage falls on the Defendant's Incentive Compensation Scale.

27.     On the Defendant's Incentive Compensation Scale, employees were to be paid at a higher Incentive Rate when their Performance Percentage increased and at a lower Incentive Rate when their Performance Percentage decreased.

28.     A change in Performance Percentage would not result in an exact percentage measure of the change in Incentive Rate—it was scaled.

29.     The Defendant represented to its employees that their Incentive Rate would increase as they completed jobs faster and minimized the Actual Time in which they completed assignments with Engineered Standard Times.

30.     The 13 Week Average Rate was based on the average Incentive Rate in the previous 13 week period, including differentials but not overtime premiums and time not worked.

31.     The 13 Week Average Rate was calculated with a two week lag for each thirteen week period and was adjusted continuously.

32.     Every loss of time that affected the employees' Incentive Rate also affected the employees' 13 Week Average Rate.

33.     The Defendant would manipulate the Incentive Rate, and also affect the 13 Week Average Rate, at the discretion of management, and did not tell employees their pay rates would vary at the discretion of management.

34.     The Defendant routinely adjusted downward the Engineered Standard Times for assignments. This caused the Performance Percentages to drop, and also decreased employees' Incentive Rates and 13 Week Average Rates. This was effectively an unauthorized reduction of the compensation rate which Defendant had represented it would pay its employees. This would occur when orders were slow, productivity was at a ceiling, and the Defendant was motivated to reduce labor costs. During busy times, the Engineered Standard Times would return to normal.

6

35.     During various periods of time which should have been paid at the 13 Week Average Rate, at the discretion of management, whether or not downtime was within the employees' control, the Defendant paid less than the agreed upon rate by adding that time to its employees' Actual Time.  The effect was to drive down the Incentive Rate such that the employees not only received less than their agreed upon salary, but the employees received no additional payment for that time worked.

36.     During various periods of time which should have been paid at the Base Rate, at the discretion of management, the Defendant paid less than the agreed upon rate by adding that time to the employees' Actual Time.  The effect was to drive down the Incentive Rate such that the employees received no additional payment for that time worked.

37.     The Defendant routinely paid the Base Rate for work which should have been paid at the 13 Week Average Rate.  Defendant would assign employees tasks such as wrapping pallets, assisting with equipment, "replenishment", "put-aways", attending meetings, order processing delays, selector delays, time lapse between last order and punch out, and miscellaneous technical issues.  Defendant would routinely record that time as Base Rate Time despite that it was not within the employees' control.

38.     Due to the aforementioned unauthorized reductions in pay, the Plaintiff made frequent complaints as he noticed his pay getting shortchanged.

39.     Sometimes the Defendant would correct the Plaintiff's pay, and sometimes the Defendant refused to correct the Plaintiff's pay.

40.     The Plaintiff's complaints about being shortchanged in his pay become more frequent prior to his termination.

41.     On or about February 16, 2012, the Plaintiff while performing Selector duties suffered a workplace injury to his thumb and filed an accident report with Juan Lopez, the safety manager.

42.     Upon reporting the injury to his supervisor and the Safety Manager Juan Lopez, he called the incentive employees to hold a safety meeting.

43.     It had been the policy of the Defendant Company since approximately December 2011 for the Safety Manager to call a meeting for all incentive employees whenever someone filed an accident report.

44.     Since December 2011, and at various other times, it had been the policy of the Defendant Company to record the time of these safety meetings as "Actual Time", meaning the time used to calculate and drive down the employee's incentive rate, rather than recording the time as downtime paid at the Base Rate.

45.     The Plaintiff pleaded with Mr. Lopez not to call the meeting because he did not want his coworkers to suffer the cut in wages, and questioned why the employees were not paid at least the Base Rate for the safety meetings.

46.     Mr. Lopez responded that when accidents were reported, employees were not getting paid the Base Rate during safety meetings anymore because there had been a large increase in the number of work accidents for incentive employees.

47.    The increase in the number of work accidents occurred at the same time that the new incentive system went into effect.  Prior to the implementation of the new incentive system, the number of workplace injuries was much smaller.

48.    On or about February 16, 2012, following my workplace accident, my accident report, and the safety meeting, I was assigned to wrap pallets due to my injured thumb.

49.    Mr. Lopez stated that the Defendant Company's employees were having too many accidents lately, so the employees would no longer be paid during the post-accident safety meetings.

50.    On or about February 17, 2012, several Lift Operators noticed that the same machine which had often shortchanged them as to time was again making serious errors which adversely affected their pay.

51.    The Plaintiff and several Lift Operators approached the new General Manager as a group and made their complaints known to the new General Manager about being shortchanged in their wages.

52.    The Plaintiff and the other Lift Operators complained that they were again being shortchanged by the Defendant's operating system, and in particular a machine which continued to shortchange lift operators on their time output.  The lift operators had been complaining that this machine was shortchanging their pay for more than a year, and that nothing had been done about it.  Conversely, if a machine made errors to the benefit of the employees, such machines and errors would be fixed immediately.

53.     During this period of time, the Defendant was particularly defensive of complaints of workers' pay being shortchanged because there was a campaign to unionize the facility.

54.     Prior to February 20, 2012, the Plaintiff had never refused to obey a supervisor's order.

55.     On February 20, 2012, at 6:45 a.m., a water main broke in the employer's warehouse and water covered the warehouse floor.

56.     On February 20, 2012, a great deal of water turned to ice in the freezer area of the warehouse.

57.     On February 20, 2012, the Plaintiff reported to work for his 8:00 a.m. shift.

58.     On February 20, 2012, after the Plaintiff reported to work, two supervisors named Xavier Gomez and Christopher Costa supposedly went to the cafeteria where the Plaintiff and other employees were waiting, but the Plaintiff never saw Xavier Gomez.

59.     On February 20, 2012, Costa asked for volunteers to help remove water from the warehouse.

60.     On February 20, 2012, neither Gomez nor Costa ordered the employees to help.

61.     On February 20, 2012, no supervisor or manager ordered the Plaintiff to remove water from the employer's warehouse.

62.     The Plaintiff, a member of the Safety Committee, noted to his fellow employees that the removal of water seemed unsafe because in the past,

whenever a spill in the warehouse occurred, the custom and practice was to put cones around the spill and to tape off that area until it could be mopped and cleaned so that employees did not slip. The Plaintiff discussed this with his fellow employees.

63. The scope of the spill resulting from the broken water main was larger than any spill at the facility previously, and the Plaintiff (and many other employees) did not have rubber boots to walk through the spill.

64. On February 20, 2012, between 8:00 a.m. and 10:15 a.m., there were an insufficient number of squeegees to remove water from the Defendant's warehouse. The squeegees were necessary tools for removing the water, and every squeegee to the Plaintiff's knowledge was being used to remove the water.

65. On February 20, 2012, at 10:15 a.m., a supervisor named Dexter Lee ordered the Plaintiff and other employees to chip ice from the employer's warehouse.

66. On February 20, 2012, the Plaintiff stated to Supervisor Dexter Lee that he preferred not to chip ice in the freezer because the steel toed boots which employees had to wear did not have any spikes or grips to prevent from slipping on the ice.

67. The Plaintiff stated to the Defendant's shipping Manager Michael Wingate that he did not want to chip ice because he believed it was unsafe, and because he did not believe the ice chipping assignment was within his job description as a selector.

68.     The Defendant did not assign the employees any production duties in the freezer portion of the warehouse because the conditions were unsafe.

69.     The Defendant did however have other employee assignments which it could have assigned the Plaintiff.

70.     In the past, if the Plaintiff requested another assignment, the Defendant would simply issue another assignment.

71.     Instead, on February 20, 2012, the Defendant told the Plaintiff to punch out.

72.     On February 21, 2012, the Defendant terminated the Plaintiff's employment on the pretext that he refused an order.

73.     Plaintiff and several other employees were terminated on February 21, 2012.

74.     The Defendant used the incident involving the water main as a pretext to terminate a number of employees who Defendant desired to terminate. The Defendant used a pretext for the terminations to cover its true motivations, which were illegal:

    a.     Retaliation for making complaints of wage violations;

    b.     Retaliation for making safety complaints; and

    c.     Retaliation for complaints of sexual harassment.

75.     The Defendant has exhibited a pattern of retaliating against employees who have asserted protected rights, including employees who have complained of being shortchanged in their wages, employees who have

12

complained of safety issues, and employees who have brought workers' compensation claims.

**COUNT ONE:**      **Retaliation in Violation of the Fair Labor Standards Act, 29 U.S.C.A. Sec. 215, *et seq.***

1.     The Plaintiff repeats and re-alleges Paragraphs 1 through 75 above, as Paragraphs 1 through 75 of Count One as if fully set forth herein.

76.     Through the aforementioned conduct, the Defendant terminated the Plaintiff in retaliation for his complaints of Defendant's violations of the Fair Labor Standards Act.

77.     As a result of the aforementioned conduct of the Defendant, its agents, servants and/or employees, the Plaintiff has suffered a loss of wages, benefits, and other consequential damages.

78.     As a further result of aforementioned conduct of the Defendant, its agents, servants, and/or employees, the Plaintiff has been forced to incur attorney's fees and costs in order to obtain the rights to which he is entitled.

79.     The Plaintiff claims double damages, attorney's fees, and costs pursuant to 29 U.S.C. § 216(b).

**COUNT TWO:**      **Wrongful Termination in Violation of Public Policy (Plead in Alternative to Counts Three and Four)**

1.     The Plaintiff repeats and re-alleges Paragraphs 1 through 75 above, as Paragraphs 1 through 75 of Count Two as if fully set forth herein.

76.     As a result of the Defendant's conduct, the Plaintiff has suffered significant financial losses.

77.     As a further result of Defendant's conduct, the Plaintiff has been denied wages and benefits to which he is entitled.

78.     As a further result of the Defendant's conduct, the plaintiff has been caused to suffer emotional pain and suffering.

79.     As a further result of the aforementioned conduct, the Plaintiff has been forced to incur attorney's fees and costs in order to obtain the rights to which he is entitled.

**COUNT THREE:**     **Wrongful Termination in Violation of Conn. Gen. Stat. Sec. 31-51q, *et seq.* (Plead in Alternative to Count Two)**

1.     The Plaintiff repeats and re-alleges Paragraphs 1 through 75 above, as Paragraphs 1 through 75 of Count Three as if fully set forth herein.

76.     As a result of the Defendant's conduct, the Plaintiff has suffered significant financial losses.

77.     As a further result of Defendant's conduct, the Plaintiff has been denied wages and benefits to which he is entitled.

78.     As a further result of the Defendant's conduct, the plaintiff has been caused to suffer emotional pain and suffering.

79.     As a further result of the aforementioned conduct, the Plaintiff has been forced to incur attorney's fees and costs in order to obtain the rights to which he is entitled.

**COUNT FOUR:**      **Breach of the Implied Covenant of
Good Faith and Fair Dealing (Plead in
Alternative to Count Two)**

1.      The Plaintiff repeats and re-alleges Paragraphs 1 through 75 above, as Paragraphs 1 through 75 of this Count Four as if fully set forth herein.

76.     As a result of the Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiff has suffered significant financial losses.

77.     As a further result of Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiff has been denied wages and benefits to which he is entitled.

78.     As a further result of the Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiff has been caused to suffer emotional pain and suffering.

79.     As a further result of the aforementioned breach of the Defendant, the Plaintiff has been forced to incur attorney's fees and costs in order to obtain the rights to which he is entitled.

**COUNT FIVE:**      **Violation of Conn. Gen. Stat. Sec. 31-290a
Workers Compensation Discrimination and Retaliation**

1.      The Plaintiff repeats and re-alleges Paragraphs 1 through 75 above, as Paragraphs 1 through 75 of this Count Five as if fully set forth herein.

76.     As a result of the Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiff has suffered significant financial losses.

77.     As a further result of Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiff has been denied wages and benefits to which he is entitled.

78.    As a further result of the Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiff has been caused to suffer emotional pain and suffering.

79.    As a further result of the aforementioned breach of the Defendant, the Plaintiff has been forced to incur attorney's fees and costs in order to obtain the rights to which he is entitled.

**WHEREFORE,** the Plaintiff demands the following:

1. jury trial;

2. back pay;

3. front pay;

4. double damages, attorney's fees, costs and interest pursuant to 29 U.S.C § 216(b);

5. punitive damages; and

6. such other relief as the court deems just and appropriate.

THE PLAINTIFF,
JONATHAN VALDES

By: _____

Angelo Cicchiello (ct06503)
Emanuele Cicchiello (ct27118)
Michael J. Reilly (ct28651)
Michael T. Petela, Jr. (ct28251)
Cicchiello & Cicchiello, LLP
364 Franklin Avenue
Hartford, Connecticut 06114
Tel: (860) 296-5457
Fax: (860) 296-0676
Email: mpetela@cicchielloesq.com
Their Attorneys